Good morning, Your Honors. Good morning. Suzanne Luban, appearing for Mr. Sullivan, the appellant. I would like to reserve five minutes for rebuttal. The first thing I want to address is an issue that I raised in my reply brief, and didn't notice it until I recalculated the guidelines based on the Blakely claim that was raised following the submission of the opening brief. And I submit to the Court that under Benitez-Perez, a case I cited in my brief, where this Court raised to Esponte the same issue, this Court can address the issue of the wrong guidelines version being applied, which clearly happened in this case. And the difference is three levels, which is substantial. I believe it's almost a year of prison time that was improperly imposed on my client based on the use of the guidelines version at the time of the offense, the 1997 version, when in 19 — in 2002 when he was sentenced, the money-laundering guideline had been modified such that it made his guideline sentence should have been lower. I'm a little puzzled by what happened. Everybody was on notice that the PSR said 77 guidelines because we want to protect the defendant. There may be an ex post facto problem. I assume counsel received that, read it. Counsel on both sides were well aware of the issue. If anybody had just made a peep about it, we wouldn't be up here. The district judge would say, well, okay, we do it. Why do we get into it this late when it's never been raised? The district court is being sandbagged because counsel had every opportunity at that time to correct the problem. I was not that counsel, I will say. Pardon? I was not that lawyer. I understand. But clearly, I think it's absurd. But there was a lawyer there, and there's no charge the lawyer was asleep or out to lunch or anything. There's nothing in here about incompetency. So why — why is this — I guess we did decide whether there's plain air, but — There is no question that it is incompetency of counsel for trial counsel not to have raised this, not to have noticed it. I think it's probably common practice among attorneys to rely on the probation office, you know, whether they're justified in doing so. I don't find that as common practice in my opportunities as judge. I find defense lawyers are quite aggressive. On what basis do you say that lawyers rely on probation? Is there something in the record that tells us they rely on those? Your Honor, I'm not excusing counsel's conduct. I think that — I will stand here and say that it was probably incompetent of me not to have noticed it, not to have recalculated all the guidelines at the beginning, even before Blakely, just as a matter of being extra careful. And it was probably improper of me not to have relied on — me to have relied on the hope that trial counsel did that correctly. It's an error. It's inexcusable, and it changes my client's sentence by a year. I just can't — there's no excuse for it. And in order — for this Court to require Mr. Sullivan to raise a 2255 while he's in prison, by the time it gets through the courts, will probably have already exceeded the time that he would — the extra time that he would have to serve. And since this Court can address it under Benitez-Perez, I ask you to do that. I think we understand the difficulty. The problem is, A, it wasn't raised below. B, it was not raised in the opening brief, and under our rules, it's waived if it comes in the reply brief. And that's the difficulty we have with the issue, not the merits of the question, but whether it's properly before us. But you've argued the issue well. All right. Anyway, I'll move on to another issue also related to sentencing, which is Booker. Under Booker, my client is clearly entitled to be resentenced by the district court. The judge considered several grounds for departure and found that those grounds did not amount to extraordinary circumstances. Now, under Booker, the district court has discretion, and those types of considerations do not need to reach the level of extraordinary considerations. Why would you say they don't need to reach the level of extraordinary? Under the — under Booker, the district court may consider any number of sentencing requirements, including the guidelines, but they are not limited to using the guidelines of the mandatory law. So you're saying that if we should remand so the district court can consider the guidelines as advisory only as opposed to mandated. That's correct. It may make a difference in the way the district court looks at departures. Yes. That's your argument. And in this case, unlike many pre-Booker cases, there were actually these departures or these grounds for departure which did not meet the level of required for departures under the guidelines the district court found were actually raised. In many cases, those things aren't even raised because they're disfavored. But in particular, my client's good works and his work on world hunger projects throughout the world, these were things that were considered by the district court but were not found to reach the level that would have been required under the guidelines to give him a break. In addition, he had elderly relatives, medical problems of his own, other hardships that were considered by the court, but discarded because they are disfavored factors and under the mandatory guidelines in place then were not proper to be considered and did not reach the level that the court would have to find them. So at that point, hopefully, if it is remanded, then perhaps the district judge would also consider the proper version of the guidelines if this Court doesn't act on that point. And I'd like to move on to the claim of insufficiency of the evidence. The government says that the ---- here, I'll find the ---- that ---- oh, I've lost my tab. Anyway. Ginsburg. Well, in what way are you saying that the evidence was insufficient? Sherry. In 1995, my client contacted and became involved with this company QAP. We know the facts. I'm asking you, in what way specifically are you saying that the evidence was insufficient? He, for years before he met Mr. Costamagna, who's the alleged victim and who was a victim in this case, he was involved in the sale, setting up the business deal, participating in writing a report that helped the company get out of bankruptcy, and working together with other partners who are ---- there's been no allegations. There was never any evidence that the other individuals involved in the Acosita group were fraudulent ---- fraudulent partners in any crime. So Mr. Sullivan is presenting a buyer, a European buyer, for this company two years prior to the time he's introduced to Mr. Costamagna, and yet the government contends that the quote, the only way that he could have funded this house is to defraud Mr. Costamagna. But he doesn't seek out Mr. Costamagna. He ---- the allegation is that he created the company and that the company was a fabrication that there was really no buyer. How is that insufficient? How is that insufficient evidence if the jury believed the testimony that was presented by the government? There was actually no evidence that the company did not exist. There was evidence that individuals from QAP made some efforts that were acknowledged to be insufficient and undirected to try to locate a company in search of water. Is it essential to the government's case to prove that Newfield doesn't exist? Yes. That's kind of difficult to do, because that is proving a negative. So we would have to assume the obligation of what, of going through, searching every State and every country to see whether Newfield had been incorporated someplace? The principal witness is dead. The principal witness that testified before the grand jury is dead. That's correct. So the government had no evidence. It's the government's burden to present evidence that it was a fraud, that the entire financial transaction was a fraud. Otherwise ---- We can't find any letterhead. We have no business cards. We have no evidence of any Swiss corporation here. There's nothing to show. There's nothing to show that Newfield existed anyplace. It would have been very simple to come forward even with a piece of letterhead or a business card, wouldn't it? For the defense, that's right. It would have been very simple for the defense to have come forward with something to show that this corporation existed. The defense has no obligation to present evidence in a criminal case. It's the government's obligation to prove beyond a reasonable doubt its contention. So for two years, Mr. Sullivan is involved with this company and with QAP and presenting information about this European investment company. And then two years later, he's introduced to another buyer, potential buyer, of QAP. And the government's contention is that all that time he was laying the groundwork to ensnare this gentleman who he had never met before, who was presented to him by QAP as a potential buyer. But it's pretty clear that there were mingling funds, isn't it? I'm sorry? The juxtaposition of Mr. Sullivan accepting the check from Mr. Costamanga and then purchasing the house when he did not have sufficient funds to purchase the house, pretty striking, isn't it? They're close in time, yes. And how close in time? Two weeks? Well, the he signs a contract, though, to buy 1 million, 1, whatever it is, 5 percent of the company for a million dollars several months before the housing, the house closes. So he gives him the check a few, shortly, right shortly before. But the timing of the payment to your client and the timing of the payment that was made to you on the house were a day apart? I think it's within a week, but not quite that close. I'll move on to another issue. All right. The – with regard to the prosecutorial misconduct in the grand jury, this Court has inherent supervisory powers or under due process the power to dismiss the indictment in a case where the government affirmatively misled the grand jury. Now, it's true that the government does not have to follow the Heersey rules or other rules of evidence, and the government may offer a summary witness, an agent, to testify before the grand jury. But this agent in this case testified affirmatively that there were more – multiple sources of the information that he got from one person, a very ill individual who was no longer available to testify, at least who didn't available to testify at trial. So that's the misconduct that the agent said there were – said? Did he say there were multiple sources? He said in one part of – in the beginning of his testimony, he said Newfield is merely a shell company. And then when asked how does he know that, he said, I got that information from the interviews conducted – interviews, plural, conducted by agents, plural. And so that's the affirmative misrepresentation that you say justifies dismissal of the indictment? Yes. But then he goes on to testify that Mr. Delos Fisher gave this information. And he doesn't reveal that actually that's the same – there was only one interview. It's the interview of Mr. Fisher. That's the only information. What that does is affirmatively mislead the grand jury into believing that the FBI corroborated his claim and that they had multiple sources of information that Newfield was a shell company, that it had no investors and no value. What's the closest case authority you're relying upon to support your argument? The Mango. I think I'm pronouncing it right. But the error was compounded because then the prosecutor goes on to lead the agent through a series of questions, one after another, that all are yes or no questions, that call for legal conclusions. Did Mr. Sullivan make false statements? Did he lull Mr. Costamagna? Did he provide false documentation? There's no evidence that the documentation was false. It's an inference that the agent – it's his opinion, certainly, that they're false, but there was no evidence because all the agent was relying on was statements by Mr. Fisher. So he can say Mr. Fisher says they're false, but he – but the agent didn't know that, and he certainly didn't corroborate it. And by testifying that he had obtained this information from multiple sources, he misled the grand jury and impaired their ability to exercise their independence. But, counsel, the case you rely upon appears to hold that only where knowingly perjured testimony is presented is there grounds for dismissal. Are you making the assertion that the prosecutor in this case knowingly presented perjured testimony? Well, the prosecutor perhaps did not ask a question designed to elicit the false impression, but once it was revealed, certainly prosecutors have an obligation to correct false information, false testimony from their own agent when they hear it and they're standing there in the grand jury room and they hear that the agent has testified essentially falsely, created a false impression by his testimony. It's artful, certainly. It wasn't a direct lie, but it created the false impression that, I would say, under due process, the prosecutor had an obligation to correct. The case you cited says that the misconduct must be flagrant. Do you characterize this as a flagrant violation of the prosecutorial duty? Well, that's a question of degree, and certainly, I think, because the prosecutor then first didn't correct it and then went on with this series of yes-or-no questions designed to take the grand jury, you know, to tell the grand jury what the opinion of the agent was without couching it in terms of opinion, but rather couching it as if it were fact, and that I've quoted the testimony of the agent, you know, in that regard, those questions in my opening brief, that that made it, that rendered it flagrant, the combination of those factors. Just, if I have any, a little more time. I would like you to address the question of the restitution. I was just going to get to that, Your Honor. It's clear under Ninth Circuit law that prejudgment interest is not properly included in restitution. Now, in this case, there are actually not. What case are you saying makes that clear, that prejudgment interest is not? I believe it's pronounced Sablan, United States v. Sablan, which talks about that only laws, and also the statute. The statute specifically talks about that restitution must be applied first to principal, and that's Section 3612, lowercase i. And in lowercase f, the, of that same section, it talks about the things that may, that restitution may go to, and it lists post-judgment interest as one of them. And does not list prejudgment interest. So specifically under the statute, it's excluded. They had agreed in the civil settlement that the payment would go to interest first, right? That's right. And the civil settlement has a factor. But why does the statute even come into play? Well, the civil settlement doesn't control the criminal order of restitution, and it doesn't state in there that he will then submit to a criminal order of restitution along the terms of the civil settlement. Where does the MVRA say that it has to go, that it can't go to interest? It doesn't specifically say it can't go to prejudgment interest, but it doesn't It lists the things that it may go to in order, and they are that it must go to principal first. How would you distinguish for it? I actually don't have that on the top of my tongue. Which one is that? Let me ask you a question. I think you have a good argument as to valuation of the house. But the house was actually sold about six months later, as I recall. Is there anything in the record to show your client was prejudiced? That is, a big swing in the market on housing or anything? That was not in the record, Your Honor. But it is in the record that my client paid $18,000 in expenses that he was contractually required to do. And under their contract, he was supposed to be credited those expenses. I understand that part. You've got a good argument. I'd like to hear from the government on it. But the issue of the sale being six months later, was there any evidence in the record that the price or the value of the house changed in that six-month period? I don't believe there's any evidence in the record, Your Honor. I think that the fact that it took so long and the fact that Mr. Costomagno used a real estate agent that charged him twice what a normal real estate agent usually charges prejudices the client. He may not have been prejudiced by the mistake. I'm sorry? He may not have been prejudiced by the mistake. Well, he was prejudiced by the difference in the dollar amount, because it reduced the amount that Mr. Costomagno received and, therefore, what the Court credited. But that's because of the expenses that he paid. That's right. That's the amount he paid. Now, you have a good argument on that. But I'm just thinking the value of the house over the six-month period, whether he lost anything. There was no evidence in the record about the market. And the home was in Carmel, Indiana. Is that right? That's correct. Okay. And it was their residence. So they moved out and turned it over to Mr. Costomagno, but still paid him. And where is Carmel? I don't know. It's not in California. It's in Indiana. It's not Carmel, unfortunately. And I'm sure that that could have been done, but it was not done, the evaluation study. All right. Counsel, you have 1 minute and 52 seconds for rebuttal. Good morning, Your Honor. It's Stan Butt on behalf of the United States. I'd like to address the first issue that was addressed by counsel this morning with regard to the inaccurate or the inapplicable sentencing guidelines that were applied in this case. I'd like to address the issue under the plain error analysis in this case, because, frankly, those issues were not raised, and they were raised in the rebuttal. To suggest that it was error for the district court to apply the 1997 as opposed to the 2002 is also an error. And I realize that a lot of the discussion that I am going to have today with the court is under the plain error analysis. But in this case the government was there, and the government usually is pretty careful about making sure there's no sentencing error, so they don't have to have it on appeal. When the PSR said that the defendant is going to be prejudiced, may be prejudiced, did the government agree with that? Yes, Your Honor. That there was a problem? No. I do not agree that there was a problem, and I will tell the court why. Again, this is not part of the record, but in this particular case, the guidelines change drastically when dealing with lost calculations between the 1997 guidelines and the 2002, specifically in the area of definition of loss. In this particular case, there was a possible ability of the government to seek losses in the efforts that Mr. Costamagna went to collect on the monies in the form of attorney's fees under the foreseeability analysis in this case. And that was because Mr. Sullivan had a 22-year past history of fraudulent conduct in which judgments were entered against him for what the government termed was fraudulent conduct. Under a foreseeability analysis, Mr. Sullivan knew exactly the M.O. in this case. Mr. Sullivan knew that just litigate these cases, and that's exactly what he did in this case. Mr. Costamagna, in addition to losing his $394,000, had to ultimately litigate this case for two and a half years at a minimum. It took five years between the time he gave the money and he got some sort of stipulated judgment in this case. But, counsel, at the time of sentencing, you have a snapshot of amount of loss. A snapshot of what, Your Honor? Of the amount of loss. Yes, Your Honor. Isn't that what we're talking about, the amount of loss? Yes, Your Honor. So at the time of sentencing, the government knew what the amount of loss was at that time. Correct. And so based on that amount of loss, what was it, should the 2002 guidelines have been used or the 1997 guidelines? The 1997, because the 19 yes, the 1997, because the foreseeability, the the, in 2000 and 2001, the guidelines changed drastically. That argument with regard to the foreseeability analysis as to the efforts of Mr. Sullivan to defraud Mr. Costamagna, which resulted in additional loss to Mr. Costamagna through costs and attorney's fees in attempting to collect his money, would not have been calculated under the 1997 loss analysis. But, counsel, I thought the consideration was that the guideline, the guideline version that is most favorable to the defendant is supposed to be used. And it was applied in this case, absolutely. So you're saying that 1997 was more favorable than the 2002? Absolutely. Because the two the Counsel said he's spending an extra year in jail because he's under the, not under the 2000, 202 guidelines. Because he's not under the 2002. And I will tell you, because in looking at a plain error, counsel just looks at the PSR, the four corners of the PSR, and doesn't know what counsel for the government knows with regard to the loss calculation. Counsel, when the court is sentencing, the court is not looking into the government's as to the government's thinking about foreseeability. The court is also looking at the PSR and what the evidence is regarding calculation of amount of loss. So you're losing me on your argument that the 1997 guidelines were more favorable to the defendant. I'm not following your argument on that. Because, Your Honor, because it was not raised at the district court level, the parties were not able to address that. And I frankly cannot remember that after the sentencing, after the conviction, that as practice for me, counsel will often ask me, what is your position with regard to the loss? And I frankly do not remember whether I discussed that matter with Mr. — with the defense counsel in that case and told the defense counsel the government is going to seek these additional losses. That information was provided to the probation officer. Again, that's nowhere in the record. So — Tell me, from what's in the record, do you agree that when we sent — if we — Yes, Your Honor. — that we need to send this back for a Booker examination? No, Your Honor. And the reason I say no to that is also what gets into my — the discussion is the inappropriate guidelines. Well, the reason I'm asking is, of course, if we send it back for Booker, the district court is going to look at this. I understand. Even if it's plain air, even if counsel waived it because they didn't have it in a blue brief, if we do a Booker, it's bound to come up, and the 202 is going to be on the table. 202 is going to be on the table. We have sort of been following the policy that we need to let the district court look at these Bookers, at least we've talked about it. Why shouldn't we let the district court take the first cut of whether Booker requires something different? There is, as indicated, perhaps some parts, counsel's argued quite well, that there's some areas that are now discretionary may turn out a little different. Your Honor, in this case, the district court considered both the downward departure and an upward departure request by the government, balanced out the information. I think that all the parties would agree in this case that information was supplied with regard to the defendant in this case, and information was provided by the government with regard to a vigorous case as to where this defendant should be sentenced. In this case, applying plain error with regard to the Booker analysis, there is no prejudice that would result from this defendant, because the district court had an opportunity to downward depart. The district court felt and balanced carefully whether or not taking these considerations into effect based upon the defendant's past year, past history, as well as the conduct in this case, balancing that out against any medical issues as well as the effort, and found that the sentence in this case was appropriate. Counsel, I have to tell you, as a district court judge, one would look at the guidelines a lot differently when they're mandatory as opposed to when they're advisory. It could make a huge difference in terms of the way the district court judge approaches sentencing if, on the one hand, he's bootstrapped by the guidelines, and on the other hand, he just is advised by the guidelines. So I'm not sure that I buy your argument that the district court judge would have done exactly the same thing under a Booker analysis. I think so based upon my experience also, Your Honor, before the court. If the court finds a basis for downward departure, it finds a basis for downward departure and downward departs. And in this case, there was ample evidence presented by which this district court could have downward departed. That's simply not true, because there are some bases for downward departure that the guidelines said that you absolutely cannot consider. And if they're advisory, now those can be considered. So, you know, as a district court judge previously myself, I can tell you that it's going to make a difference. It may, Your Honor, but it – is it the analysis and the plain error that we – it may make a decision, or is there an ultimate prejudice? If the court is going to find that, then all these cases – all cases that are present – presently before all the courts of appeals should then be sent back for that consideration. Maybe not, but opposing counsel made a good point that in some of the cases the issues weren't raised, which may be a different consideration. But if the issues were raised in this case, and previously they were not – the issues were not ones that could be considered as bases for downward departure, but now they can be, to me that would be a different case. Your Honor, in – but in this case, the district court didn't find that, well, he balanced – the court balanced, didn't say I'm – I'm guarded, you know, I must apply this guideline, I must – I must do this, therefore, that's what I'm doing. He didn't do that. The district court didn't do that. And that's what I'm saying distinguishes this case maybe from – from your typical case, is the district court was presented with the motion for downward departure and did a balancing test right there, said, well, I've looked at this stuff and I've looked at your past conduct, including the offense conduct, and I feel that the 46 months is appropriate. Now, the district judge did not say, well, I'm – I'm bound by the guidelines, therefore, I must – Have to say that the law says that. I understand that, Your Honor. But I think that in looking at the prejudice prong, that this Court must take that into consideration in the plain error analysis, because in that particular case, with regard to the Booker issue, not with regard to the sentencing guideline application, but with regard to the Booker, the government – the government says that there was error and the error was plain. What we are looking at in the Booker analysis is the prejudice prong. And again, the government asserts that that is not met for the reasons stated. I'd like to address the prosecutorial misconduct, because I think that is also based upon some assumptions that are also inaccurate. And again, that was not raised at the district court level. There was not an effort to further establish the record with regard to that. There was no motion to dismiss with regard to prosecutorial misconduct. The defense had the opportunity to bring that, or at least to the minimum, to bring a motion for new trial, and that was not raised. But to suggest that the agent gave false testimony is inaccurate in this case, because this agent – I mean, again, this is issues outside of the record, but to assume that was, in fact, the case is – should not be assumed by this Court. Do I understand you correctly? There was no – this was never raised in the district court. There was no motion to dismiss. Absolutely not. There was a motion to dismiss the indictment, and that was based upon that the government was a collection agency for Mr. Costamagna. That was considered and denied by the district court. But not based upon grand jury misconduct. It was not based upon grand jury misconduct. The defense raises an issue in the opening brief that states that, well, we – the defense did not have an opportunity because they were not provided with the grand jury transcript. In its reply – or in its response brief, the government points out that while not at the original motion, the defense made a subsequent renewed motion. That was available. And at a motion for new trial, that transcript was available. And at the motion for new trial, the defense re-raised the issue of the collection agency and again failed to raise such an issue. So I – I take offense to the fact that there is prosecutorial misconduct and this Court reviews it at this level based upon perjured testimony or some sort of false testimony, which is inaccurate. Which is inaccurate in this case because you could – at trial, you could see that Mr. Delamater testified as to the efforts that he went to. You can look at the efforts that Agent Rapucci went to in this particular case at trial also. And to suggest that they relied solely upon the information of Mr. Delos Fisher is – is inaccurate. And the government has pointed out that exculpatory information need not be presented, but it wasn't exculpatory in this particular case with regard to the $100,000. And we pointed that out in the brief. I'd like to address the issue of restitution in this case because I think that that is – is of some importance in this particular case. Maybe you could – we seem to have some difficulty with the failure to give credit for mortgage payments, tax and insurance after the transfer occurred. Was that an abuse of discretion, the trial court, not to consider that? No, it was not, Your Honor, because again, this particular issue was not raised at the district court level. That is subject to plain error analysis. With regard to the – there's two parts to this restitution argument. And one is the prejudgment – what I will call the prejudgment interest section. Now, in this case, what – why we are talking about prejudgment interest is not because the government asked for all prejudgment interests be applied from the time that he gave the money between the periods of August and October of 1997 to the date of sentencing. What we are talking about here is the stipulated judgment entered into November of 2002, which states that the money given by the defendant in July of 2000 will be apportioned accordingly. That's what we are talking about prejudgment interest. The government did not ask for prejudgment interest from July of 2000 all the way to the date of sentencing in this particular case. But the reason the government points out the MVRA and the subsequent case, what we believe to be case law supportive of this position, while not directly on point, but supportive of prejudgment interest, is the defense characterization of this prejudgment interest. The stipulated judgment itself says that this shall be applied to interest, the $75,000, and the remaining $24,000 shall be applied to principal. That was in the civil case? Yes, Your Honor. And so what's your response to opposing counsel's argument that stipulated judgment in a civil case does not trump the statutory requirements in a criminal case? The statute, the MVRA speaks, does not speak with regard to the calculation of prejudgment interest. Counsel points out 3612, subsection F, which was also pointed out by the government. But that read in that context is dealing with post-judgment administration. As to where monies will be applied. That has nothing to do with prejudgment adjudication. And when I mean judgment, I mean criminal judgment. What about opposing counsel's argument that in the MVRA, there is a listing of what may be assessed and that excludes prejudgment interest by its omission? I think that that does not take into account 3664 F1's requirements in the MVRA. The only thing that does, and it is in the MVRA, it's in the Mandatory Restitution Act, which says that the victim shall be provided full restitution. And as part of that, and the cases that I have cited suggest that that can be done. And again, we are looking to a plain error analysis in this. If I may ask counsel how she would distinguish Gordon, U.S. against Gordon, and I think she was unaware of the case. Doesn't Gordon answer the question? I'm also unaware of it, so. Gordon was a very interesting opinion by Judge Clifton of our Court dealing with the VWPA and saying that prejudgment interest is available. I had thought that was the issue before us. Well, the issue I have also cited, Catherine, which also defense counsel says that that is dictum, but it is something that prejudgment interest I think is calculated, and there's nothing that bars it. And in this case, again, we are not asking for prejudgment interest from August 1997 all the way to the sentencing. We are just doing an apportionment. The defendant here agreed to it, and therefore, it is correct, and under a plain error, I don't think it's subject to prejudice by the defendant, because the defendant agreed to it and says this amount shall go to this. Now, the additional issue, which I think is of even more concern to the government, is this valuation process, the last part of the restitution. And in this particular case, as pointed out in the government's brief, the victim gave cash to the defendant. After five years of litigation, et cetera, this defendant eventually then transferred the home back to the victim in this case. The victim thereupon sold the residence in this case. Six months later. Yes, Your Honor. Yes, Your Honor. Now, in, again, not part of the record, but in my discussions with, there was a certain point in time where Mr. Sullivan's wife was still residing in the residence. And, but I don't think, it was not for that full six-month period. I could not recall exactly when that was. But again, this was not raised, therefore, it's a plain error analysis. But it ultimately gets into what was the prejudice. Was Mr. Costamagna looking to rent this place out and maybe using it as an investment? Well, he could have sold it immediately, and then we wouldn't have any questions about valuation at point A and valuation six months later at point B. We also wouldn't have questions of $18,000 in PITI payments that have been made by Mr. Sullivan. So Mr. Costamagna owns the house, but as I understand it, Mr. Sullivan was continuing to make the mortgage payments. Isn't that right? There was a part where he was making the mortgage payments pursuant to the stipulated judgment. But also keep in mind that the defendant's wife was there for a portion of that time. Okay. Well, you're arguing, then, that we should have been entitled to some kind of an offset based on what? Some kind of an equitable leaseback or something? Well, I mean, there is an opportunity – there is the point where when that house was transferred, the Sullivans are not out of it. And again, it's a plain error analysis. And that is in the record or that is not in the record? That is not in the record. That's not in the record. Okay. Because it was never raised, and the victim in this case, you know, to give you and say, point to the record, this is why the victim did what he did for six months. I can tell you, I'm sure the victim wanted his money and didn't want the house, keeping in mind that this is an out-of-state transaction where – Right. But he could have just sold the house out from underneath him at any time, right? He's got title to the house. He doesn't have to wait six months to get rid of it. He's got title. He can sell it. Well – If he wants his money now, he doesn't have to wait for six months to move on to the house, right? Not necessarily, Your Honor. And I think that the Court can see transactions in which it's not that easy for somebody to sell a house if you still have a tenant in there because there are certain – I'm not familiar with Indiana law. I don't know why there was a six-month period of time there. But what is the prejudice to the defendant in this case as a result of that? Mr. Castamaglia sold the residence, converted it to cash, and I think it's appropriate that he be given in converting that. There's nothing – he didn't take any extra expenses or do any lavish where he's padding the bill. This is what he got out of it. He gave cash. He converted it back to cash. There's nothing in the record to say what was the value here as opposed to the value here. It could have been higher after six months. We don't know. As I understand it, though, there's two different questions here. One is, did Mr. Castamaglia, by not selling the house for six months, get some additional boost out of this because the market had shifted? This is Carmel, Indiana. My recollection is that Carmel is fairly rural and probably not dramatic swings in the real estate market in Carmel over that six-month period. The more important question to me is, is the $18,000 in payments that Mr. Sullivan has continued to make for which it doesn't appear that he got any credit. Now, why shouldn't that just be an offset? I see my time is up. May I answer the question? Yes. With regard to the payments, those payments would obviously be applied should you give it a dollar-for-dollar credit. And I think not, because those amounts are going to pay the mortgage, which then brings down the principal, and to pay his interest on the loan in this particular case. And, again, we don't know at what point in time Mrs. Sullivan left the residence, et cetera. We don't know that information. That's an interesting response. I think it suggests that there should be some offset to all of that. But it's not clear why it isn't even under a plain error standard, why it isn't plain error not to have credited dollar-for-dollar payments by Mr. Sullivan to Mr. Costamanga at a time when Mr. Costamanga now owns the property. Because I think at looking at this record here to make assumptions such as this without any – is there a clear error in this case? There is nothing to suggest that there is an error, because we pointed out that that provision in the Mandatory Restitution Act, and I realize that the Court may not want to address it, but that doesn't – that, frankly, it doesn't apply because of how the Mandatory Restitution Act is written. When property is lost or damaged, the return of the property, not property, but the property, it suggests that when you lose, like, a car or something like that, that that property comes back. It's very difficult to make the victim full restitution in this context when you take property in one form and then are given it back in another form. It doesn't – it doesn't apply. If Congress intended it to be a property or property, it would have said it. But it says the property. And I know – That – that suggests something different, then. That suggests that Mr. Costamanga or maybe the government should have insisted that Mr. Sullivan liquidate the property and then turn over the proceeds to Mr. Costamanga so that he's not encumbered with the property. I don't know what vehicle I could have done that at the time. The trial hadn't even started at the time that the property was transferred. There's no vehicle for the government to exercise such an option or a remedy for the government. Mr. Costamanga doesn't – he doesn't need the house. He doesn't care a whit about the house. Right. He wants the money. He just wants the money. Right. So why didn't we – why didn't somebody insist that he just get the money? He didn't care how Mr. Sullivan came up with it. Mr. Sullivan can liquidate stocks. He can sell his stamp collection. Right. He can do whatever he wants. If he wants to sell the house, sell the house. All he wants is dollars. But Mr. Sullivan – I'm sorry, Mr. Costamanga accepts the house. Well, frankly, based upon a two-and-a-half-year litigation, actually longer than that, I mean, what would any reasonable victim do? I'll tell you what. I would take the house, because as we showed in the record, there was plenty of money in Mr. Sullivan's account to pay Mr. Costamanga. He didn't. He was stalling. I'll tell you what. I would never tell any victim, wait it out, get the tangible format in which you received it in, get the house. And I think Mr. Costamanga is the victim here, should receive full restitution, and he exercised due diligence. He sold that residence in this case. If the Court wishes to do it another way, I don't think that's consistent with the Mandatory Restitution Act to give a victim full compensation. There's nothing here that I believe that Mr. Costamanga did wrong. He did everything right after five years of trying to get his money back. Five years. And I think that that has to be taken into account. Mr. Costamanga didn't get his attorney's fees as a result of this. He will never see that money that he spent in this case. Thank you. Thank you, counsel. Rebuttal. I just want to quickly point out in my excerpts of record, page 141, paragraph 3, which is the stipulated judgment, specifically says that the defendant shall be credited. Well, I guess it wasn't the defendant there. Mr. Sullivan shall be credited against these interest payments for all of the expenses to be paid, the PITIs to be paid on the property. So it was even if the – even if it were proper for the district court in this criminal case to enforce a civil judgment, which I submit it was not, that that provision then should have been honored, and that would have given him credit for that. With regard to which guidelines version apply, now the government is saying that, oh, they could have jacked up the amount of loss to by adding in Mr. Costamanga's attorney's fees. They would have, first of all, if that is even to be considered, have to have been reasonable. And Mr. Costamanga had his attorneys present at every single criminal hearing, and certainly they spent a lot of money, I think, in attorney's fees that was unnecessary. But the Court would have had to grant up to 50 – more than $50,000 to get to go a bump up to the next level under the 1997 guidelines for it to have been even up, you know, one more level for it to have been more harmful to Mr. Sullivan than to be sentenced under the 2002 guidelines. And that's it. Thank you very much, Justice Sotomayor. Thank you to both counsel. The case just argued is submitted for decision by the Court. The next case on calendar for argument is Safeway.
judges: Wallace, Rawlinson, Bybee